United Therapeutics Corp. v. Liquidia Techs., Inc., 2025 NCBC 37.

STATE OF NORTH CAROLINA

DURHAM COUNTY

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
21CVS004094-310

UNITED THERAPEUTICS
CORPORATION and LUNG
BIOTECHNOLOGY PBC,

Plaintiffs,

v.

LIQUIDIA TECHNOLOGIES, INC.
and ROBERT ROSCIGNO,

Defendants.

**ORDER AND OPINION ON
DEFENDANT LIQUIDIA
TECHNOLOGIES, INC.'S MOTION
FOR SUMMARY JUDGMENT**

**[PUBLIC]**[1]

1.     Dr. Robert Roscigno (Roscigno) spent a decade working with United Therapeutics Corporation (UTC) to develop a therapy for pulmonary arterial hypertension (PAH) using the drug treprostinil.  When he resigned in June 2007, UTC alleges that he left with a number of documents that UTC contends contain trade secrets chronicling its drug development efforts.  Some eight years later Roscigno joined a competitor, Liquidia Technologies, Inc. (Liquidia), to lead that company in its development of an inhaled treprostinil treatment for PAH.  UTC alleges that Roscigno used its trade secrets while employed by Liquidia, giving Liquidia an impermissible head start in its drug development efforts.  Liquidia now moves for summary judgment arguing, among other things, that the documents at

---

[1] Because certain materials referenced in this Order and Opinion were filed under seal, the Court's ruling was provisionally filed under seal on 23 July 2025.  The Court then permitted counsel for the parties to confer and advise the Court whether they contend any matters referenced herein should be sealed.  Having afforded the parties this opportunity, the Court now files its Order and Opinion on the public record.

issue do not contain trade secrets. (Liquidia Technologies, Inc's Motion for Summary Judgment [Motion], (ECF No. 284).)

2. Having considered the Motion, the related briefing, the arguments of counsel at a hearing on the Motion, and other appropriate matters of record, the Court concludes that the Motion should be **DENIED**.

> *Brooks, Pierce, McLendon, Humphrey & Leonard, L.L.P, by Eric M. David, Jim W. Phillips, Jr., Kasi W. Robinson, and Sarah N. Schiavone; McDermott Will & Emery LLP, by Douglas H. Carsten, Arthur P. Dykhuis, Katherine Pappas, Joshua Revilla, Courtney Seams, and Lillian J. Spetrino; and Goodwin Proctor LLP, by William C. Jackson, for Plaintiffs United Therapeutics Corporation and Lung Biotechnology PBC.*
>
> *Parker Poe Adams & Bernstein LLP, by Stephen V. Carey, Corri A. Hopkins, and Andrew P. Tabeling; and Cooley, LLP, by Jonathan Davies, Sanya Sukduang, Lauren Strosnick, Adam Pivovar, Rachel L. Preston, Phillip Morton, Daniel Knauss, and Kyung Taeck Minn, for Defendant Liquidia Technologies, Inc.*
>
> *McGuireWoods LLP, by David E. Finkelson, Miles O. Indest, Mark E. Anderson, Corrine S. Hockman, and Kyle S. Smith, for Defendant Robert Roscigno.*

Earp, Judge.

## I.    FACTUAL BACKGROUND

3. The Court does not make findings of fact when ruling on a motion for summary judgment. Instead, the Court summarizes below the material facts it considers to be uncontested and those facts on which a material dispute forecloses summary adjudication. *See, e.g., Vizant Techs., LLC. v. YRC Worldwide, Inc.*, 373 N.C. 549, 551 (2020); *Ehmann v. Medflow, Inc.*, 2017 NCBC LEXIS 88, at *6 (N.C. Super. Ct. Sept. 26, 2017).

<u>Roscigno's Employment with UTC</u>

4.      Plaintiffs UTC and Lung Biotechnology PBC (collectively UTC) and Defendant Liquidia are competitors in the development of treatments for PAH, a rare disease involving abnormally high blood pressure in the lungs.  Elevated pressure strains the right side of the heart as it pumps blood to the lungs and ultimately could lead to heart failure.  (*See* Vallerie V. McLaughlin, *et al.*, *Addition of Inhaled Treprostinil to Oral Therapy for Pulmonary Arterial Hypertension*, 55 J. AM. COLL. CARDIOLOGY (2010), ECF No. 285.1; UTC Annual Report (Form 10-K), ECF No. 256.3.)  While there is no cure for PAH, the U.S. Food and Drug Administration (FDA) has approved several drugs for its treatment.  (*See, e.g.,* Flolan Prescribing Info., ECF No. 285.2; Ventavis Prescribing Info., ECF No. 285.3.)

5.      Roscigno was employed by UTC from 1997 to 2007.[2]  (Def. Robert Roscigno's Aff. Supp. Mot. Summ. J. [Roscigno Aff.] ¶ 3, ECF No. 212.6 (under seal), ECF No. 376 (public version).)  At the start of his employment, Roscigno was involved in the clinical development of Remodulin®, a PAH treatment with the active ingredient treprostinil.  (Excerpts of Sept. 20, 2023 Dep. of Robert Roscigno [Pls.' Roscigno Dep.] 283:2−8, ECF No. 303.7 (under seal), ECF No. 366.7 (public version).)  UTC first received FDA approval for subcutaneous administration of Remodulin® in 2002, followed by approval for intravenous administration in 2004.  (Remodulin®

---

[2] Roscigno served as the Senior Vice President and then President of Lung Rx, Inc., a wholly owned subsidiary of UTC.  Plaintiff Lung Biotechnology PBC is the successor-in-interest to Lung Rx, Inc.  (Pls.' Roscigno Dep. 22:18−23:1; Second Am. Compl. ¶ 14, ECF No. 154 (under seal), ECF No. 155 (public version).)

Prescribing Info. (2002), ECF No. 285.10; Remodulin® Prescribing Info. (2004), ECF No. 285.11.)

6. After successfully obtaining FDA approval for Remodulin®, UTC sought to develop an inhaled treprostinil treatment for PAH. It tasked Roscigno with overseeing this work. (Pls.' Roscigno Dep. 23:2–24:1.) Roscigno designed protocols, collaborated with pharmacokinetic consultants, participated in meetings with regulators, and oversaw the program budget. (Pls.' Roscigno Dep. 25:1–27:17; *see also* Aff. and Expert Report of David W. Feigal [Feigal Report] ¶ 87, ECF No. 255.17 (under seal), ECF No. 335.17 (public version).)[3]

7. UTC ultimately succeeded in its efforts. In 2009, it received FDA approval for Tyvaso®, an inhaled treprostinil treatment delivered through a nebulizer. (Tyvaso® Prescribing Info., ECF No. 285.12.)

Roscigno's Resignation and Subsequent Employment with Liquidia

8. Roscigno resigned from UTC on 18 June 2007. (Roscigno Aff. ¶ 8.) At the time of his resignation, Tyvaso® had not yet received FDA approval. (*See* Feigal Report ¶ 79 (observing that Tyvaso® was not approved as an orphan drug until 9 April 2009).)[4]

---

[3] On 9 September 2024, Liquidia filed a Motion to Exclude the opinions of UTC's expert, Dr. David W. Feigal (Feigal), both at summary judgment and at trial, (ECF No. 312). On 23 July 2025, the Court entered an Order granting in part the Motion and excluding certain of Feigal's opinions. (*See* Order on Mot. Exclude, ECF No. 382.) While the Court cites to Feigal's expert report throughout this Opinion, it does not rely on any excluded statements or opinions.

[4] "An orphan drug is a drug intended to treat a condition affecting fewer than 200,000 persons in the US, or which will not be profitable within 7 years following approval by the FDA[.]" U.S. FOOD & DRUG ASSOCIATION, FDA/CDER SMALL BUSINESS CHRONICLES (July 13th,

9.     Despite a practice of conducting exit interviews with departing employees, UTC has no record of an exit interview with Roscigno during which it would have requested the return of any UTC-related information.  (Dep. of Alyssa Friedrich, Individually and as Corporate Representative on Behalf of UTC [Pls.' Friedrich Dep.] 90:8−101:22, ECF No. 255.1 (under seal), ECF No. 335.1 (public version); Dep. of Alyssa Friedrich, Individually and as Corporate Representative on Behalf of UTC [Def.'s Friedrich Dep.] 135:5−136:15, ECF No. 285.17 (under seal), ECF No. 347 (public version); Memo. from A. Friedrich, ECF No. 285.18 (under seal), ECF No. 348 (public version).)  Roscigno testified that there was no exit interview. (Roscigno Aff. ¶ 8.)

10.    Roscigno began working as a part-time consultant for Liquidia in 2011 before formally joining Liquidia as its Senior Vice President of Product Development and LIQ861[5] Program Lead in 2015.  (Roscigno Aff. ¶ 10; Excerpts of Sept. 20, 2023 Dep. of Robert Roscigno [Def.'s Roscigno Dep.] 160:16−19, 162:9−13, ECF No. 285.15 (under seal), ECF No. 346 (public version); Feigal Report ¶ 89.)  Roscigno was also a member of Liquidia's "Rapid Response Team," a group of Liquidia employees designated to respond to any FDA requests relating to the LIQ861 New Drug Application (NDA).  (Excerpts of Dep. of Marissa Law Aug. 29, 2023 [Law Dep.] 34:12−23, 37:14−22, ECF No. 303.6 (under seal), ECF No. 366.6 (public version).)

---

2012), https://www.fda.gov/media/83372/download.  *See Truist Fin. Corp. v. Rocco*, 2024 NCBC LEXIS 62, at \*\*24 n. 62 (N.C. Super. Ct. Apr. 25, 2024) ("Our courts routinely take judicial notice of public filings available on governmental agencies' official websites.").

[5] LIQ861, also known as Yutrepia®, refers to Liquidia's proposed New Drug Application product for the treatment of PAH.  (*See* Feigal Report ¶ 89 n. 51.)

11. Roscigno was issued a Liquidia laptop in 2015. (Def.'s Roscigno Dep. 79:1−6.) At some point thereafter, Roscigno discovered that he was in possession of some old thumb drives that contained what he termed a "random assembly" of UTC-related information and personal information, such as tax returns and family photos. (Roscigno Aff. ¶ 10; Pls.' Roscigno Dep. 53:3−6, 54:1−5, 71:16−19; Def.'s Roscigno Dep. 280:3−9; *see also* Dep. of Charles Walton, Esq. [Walton Dep.] 171:21−172:1, ECF No. 285.22 (under seal), ECF No. 352 (public version) (likening Roscigno's flash drive to a "junk drawer.").)

12. After discovering the thumb drives, Roscigno connected one to his Liquidia-issued laptop "to refamiliarize [himself] with the PAH field, [his] publications, and [his prior work]." (Roscigno Aff. ¶ 10.) Roscigno ultimately downloaded the contents–some of which were personal and others that related to his work for UTC−to his Liquidia-issued laptop and then organized the documents into sub-folders on a Liquidia OneDrive account. (Pls.' Roscigno Dep. 72:13−73:25; Excerpts of Dep. of Robert Roscigno 17 October 2023 [Roscigno Oct. Dep.] 174:14−19, 323:17−21, ECF No. 285.21 (under seal), ECF No. 351 (public version); Aff. and Expert Report of Mark Johnson [Johnson Report] Table 7, ¶ 104, ECF No. 255.15 (under seal), ECF No. 335.15 (public version).) He accessed the UTC work-related documents (the UTC Documents) multiple times during his employment with Liquidia, including as late as June 2021. (*See generally* Johnson Report; Johnson Report ¶ 104.)

13. On 5 November 2021, Liquidia received tentative approval for Yutrepia®, a PAH treatment that delivers treprostinil via a dry powder inhaler.[6] (Liquidia Press Release, ECF No. 285.13.) UTC contends that Liquidia's success was accelerated by its use of information in the UTC Documents that Roscigno downloaded to Liquidia's OneDrive account. It contends that by possessing the UTC Documents, Liquidia was able to avoid expense and expedite its efforts to secure FDA approval of Yutrepia®. (Feigal Report, Principal Opinions; Aff. and Expert Report of Jeffrey Stec [Stec Report] at 3−4, ECF No. 255.19 (under seal), ECF No. 335.19 (public version).)

UTC's Trade Secret Documents

14. UTC complains that the documents Roscigno downloaded contain trade secret information and that, as a group, they constitute a compilation trade secret. It contends that the "documents and information were all developed by UTC as a critical part of its process of seeking, and ultimately obtaining, FDA approval for . . . Remodulin® and Tyvaso®." (Pls.' Suppl. Resps. to Def.'s First, Second, Third, Fourth, Fifth, and Sixth Sets of Interrogs. [Suppl. Interrog. Resps.] at 38, ECF No. 255.20 (under seal), ECF No. 335.20 (public version).)

15. The UTC Documents fall into six categories: (1) financial documents, (Feigal Report ¶¶ 121−38); (2) regulatory strategy and product development planning documents, (Feigal Report ¶¶ 139−73); (3) marketing documents, (Feigal Report

---

[6] Liquidia received final approval for Yutrepia® on 23 May 2025. NDA Approval Letter (May 23, 2025), https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2025/213005Orig1s000ltr.pdf

¶¶ 174–83); (4) formulations and pharmacokinetics documents, (Feigal Report ¶¶ 184–204); (5) FDA communications documents, (Feigal report ¶¶ 205–22); and (6) clinical trial documents, (Feigal Report ¶¶ 223–44). Within these categories, UTC has identified in both its Second Amended Complaint and in its supplemental interrogatory responses what it contends are individual trade secrets. (*See* Second Am. Compl. ¶¶ 20, 27; Suppl. Interrog. Resps. at 4–46.) In addition, as a whole, UTC contends that the UTC Documents constitute a compilation trade secret.

16. Once a drug is approved by the FDA, some information regarding its development becomes publicly available. (Dep. of UTC, by and through their Corporate Designee, Dean Bunce [Bunce Dep.] 76:23–77:3, ECF No. 285.4 (under seal), ECF No. 343 (public version).) For this reason and others, some of the information within the UTC Documents is public. (*See* Bunce Dep. 77:4–9; Dep. of Daniel E. Troy [Troy Dep.] 168:11–171:19, ECF No. 285.5 (under seal), ECF No. 344 (public version).) UTC does not deny that some of the information in the UTC Documents is publicly available elsewhere, albeit not in this collected form.

17. Dean Bunce (Bunce), one of UTC's Rule 30(b)(6) designees, testified that he could not determine whether particular pieces of information within the documents met the legal definition of a trade secret. (Bunce Dep. 131:2–4 ("I'm not an expert on trade secret. I can't – as a legal definition, I can't tell you what is or isn't a trade secret."); *see also* Bunce Dep. 182:3–6, 205:21–206:3, 214:13–18, 225:25–226:4, 232:21–25, 250:13–18, 261:5–10.) However, Noah Byrd (Byrd), another UTC Rule 30(b)(6) designee on the same topic, testified that together the

compiled UTC Documents provide a "soup-to-nuts roadmap on how to get a drug approved[.]" (R. 30(b)(6) Dep. of UTC, by and through its Corporate Designee, Dr. Noah Byrd [Def.'s Byrd Dep.] 9:13−18, ECF No. 285.19 (under seal), ECF No. 349 (public version); *see also* Def.'s Byrd Dep. 16:13−17, 18:7−12, 19:5−8, 67:15−21, 122:7−13, 126:14−18.) Byrd maintains that this roadmap is a compilation trade secret. (Def.'s Byrd Dep. 38:5−8 ("I would maintain that the way we go about drug development is secret. These plans, the strategy is secret. The order of events as they're contemplated . . . would be secret."); Def.'s Byrd Dep. 131:13−16 ("Again, I think that when we're talking about UTC's trade secret on how we obtain our approvals, you know, there is a methodology we follow.").)

18. But Byrd also contends that some pieces of information within individual documents are trade secrets. (*See, e.g.*, Def.'s Byrd. Dep. 28:11−23, 30:17−19, 38:3−8, 39:25−40:18, 40:24−41:4, 69:2−11; 15 Sept. 2023 Dep. of Noah Byrd Tr. Excerpts [Pls.' Second Byrd Dep.] 115:11−17, 117:3−24, 132:6−16, 180:2−15, 202:13−18, ECF No. 336.4 (under seal), ECF No. 369.3 (public version).) And he is not alone. Another UTC employee, Melissa Silverman, also identifies specific trade secret information within UTC's budget documents. (13 Sept. 2013 Dep. of Melissa J. Silverman [Silverman Dep. (Sept.)] 86:16−88:14, 106:4−20, 148:2−8, 168:15−169:21, ECF No. 336.2 (under seal), ECF No. 369.1 (public version); 18 Oct. 2023 Dep. of Melissa Silverman [Silverman Dep. (Oct.)] 12:6−20, 26:18−27:12, 29:6−22, 30:24−31:17, 32:21−33:12, 36:10−37:4, 39:2−40:24, ECF No. 336.3 (under seal), ECF No. 369.2 (public version).) In addition, UTC's expert, Daniel Troy (Troy),

opines as to specific trade secret information within the UTC Documents. (14 Feb. 2024 Dep. of Daniel Troy Tr. Excerpts [Second Troy Dep.] 269:6–18, 277:18–278:10, ECF No. 336.7 (under seal), ECF No. 369.6 (public version); Rebuttal Expert Report of Daniel Troy [Troy Rebuttal Report] ¶¶ 20–23, ECF No. 305.10 (under seal), ECF No. 367.51 (public version).)

<u>UTC's Trade Secret Protections</u>

19.     The record regarding whether UTC took reasonable precautions to identify and safeguard the secrecy of its trade secrets is mixed. According to its Chief Executive Officer, Martine Rothblatt (Rothblatt), "UTC has consistently had policies, training, and a culture geared towards protecting the confidentiality of its information[.]" (Aff. of Martine Rothblatt, PH.D., J.D., M.B.A [Rothblatt Aff.] ¶ 5, ECF No. 256.1; UTC 2006 Employee Handbook at 9, ECF No. 255.24 (under seal), ECF No. 335.24 (public version); Dep. of Noah Byrd [Pls.' Byrd Dep.] 45:22–24, ECF No. 255.3 (under seal), ECF No. 335.3 (public version) ("[W]e have a lot of training that we undergo that addresses behaving in an ethical and proper way to protect [UTC].").)

20.     However, Roscigno testified that, during his employment, "UTC operated like a start-up with a fast-paced 'Wild West' culture." (Roscigno Aff. ¶ 3; *see also* Def.'s Roscigno Dep. 27:25–28:2, 279:1–10.) He testified that UTC employees "were authorized and encouraged to exchange UTC information, without restriction, using personal thumb drives[,]" and that "UTC prioritized rapid development and information exchange over data and information security." (Roscigno Aff. ¶¶ 3, 5; Def.'s Roscigno Dep. 60:2–10, 276:5–17.) Roscigno further testified that "UTC did not

distinguish any information as 'trade secret' or take measures to train employees to protect confidential information." (Roscigno Aff. ¶ 4.)

21.     Bunce confirmed UTC's practice of downloading and transferring UTC information via thumb drives. (Bunce Dep. 286:11−13, 286:22−25.) Additionally, Rothblatt testified that "UTC employees were permitted to use [thumb] drives as necessary in the course and scope of their employment." (Rothblatt Aff. ¶ 6.) Nevertheless, Rothblatt testified that "UTC employees using [thumb] drives were expected to maintain the confidentiality of UTC information at all times." (Rothblatt Aff. ¶ 6; *see also* UTC 2005 Technology Policy § 10.1, ECF No. 255.27 (under seal), ECF No. 335.27 (public version) ("Any removable or portable electronic media containing health care information, including . . . [thumb] drives . . . must be safeguarded at all times.").)

22.     UTC considers all of its documents and information to be "confidential and proprietary." (Bunce Dep. 151:18−21, 154:20−22, 156:1−3; Def.'s Byrd Dep. 59:2−4.) Moreover, UTC's Senior Vice President and Chief People Officer, Alyssa Friedrich (Friedrich), testified that UTC does not differentiate between confidential and trade secret information. (Def.'s Friedrich Dep. 158:12−15 ("We don't differentiate, like, what the difference is between a trade secret and a – you know – and a confidential document. We just have an overarching theme about how we safeguard things that are unique to UT[C.]").) Friedrich further testified that she believes UTC employees have a "general understanding of what confidentiality means." (Def.'s Friedrich Dep. 164:5−10.)

23.    Kirby von Kessler, a UTC employee, testified that he never received instruction about maintaining information as a trade secret  (Dep. of Kirby von Kessler [von Kessler Dep.] 56:24–57:8, ECF No. 255.2 (under seal), ECF No. 335.2 (public version) ("Q. [Y]ou don't recall anybody at [UTC] ever referring you specifically to information being maintained as a, quote, trade secret when you first joined. Correct? A. I don't recall that, no."); von Kessler Dep. 58:15–24 ("Q. Did anyone at [UTC] ever inform you . . . that you should maintain different levels of security for different documents in your laptop? A. I don't recall anybody ever, you know, instructing me that or giving me guidance of that, yeah, no.").)

24.    UTC's expert, Troy, testified that it would not be "productive" to have employees determine whether something is or is not a trade secret.  (Troy Dep. 360:5–8.)  Instead, "the expectation is that any material generated by an employee of [UTC] is handled ethically and kept as confidential[.]"  (Def.'s Byrd Dep. 83:1–3; *see also* Bunce Dep. 152:6–11 (explaining that UTC employees "understand that anything created as an employee for [UTC] is considered confidential and proprietary.").)

25.    This expectation is spelled out in both UTC's Employee Handbook and its Technology Policy.  (*See* UTC 2006 Employee Handbook at 9 ("It is the policy of [UTC] to ensure that the operations, activities, and business affairs of [UTC] are kept confidential. If employees acquire confidential or proprietary information about [UTC], it must be kept in strict confidence[.]"); UTC 2005 Technology Policy §§ 1.2, 2.7 (stating that UTC media is company property to be used for UTC's benefit alone.).)

26.     Additionally, UTC includes confidentiality and non-competition provisions in its employment agreements and mandates that its employees assign to UTC intellectual property rights developed during the course of employment. (*See, e.g.*, Dr. Roscigno's 1997 Agreement with UTC, ECF No. 212.1; Dr. Roscigno's 2007 Agreement with UTC, ECF No. 212.3.)  Likewise, UTC uses non-disclosure agreements with third parties who are exposed to sensitive information. (von Kessler Dep. 223:25−224:15.)

27.     Rothblatt testified that UTC restricts access to trade secret information contained in both hard-copy documents and electronic documents. With respect to hard copies, "proprietary" documents are maintained in locked file rooms and locked file cabinets with restricted access.[7] (Rothblatt Aff. ¶ 4; Suppl. Interrog. Resps. at 90−91.)  Electronic documents are maintained on password-protected company devices and servers. Access is limited to individuals subject to non-disclosure obligations. (Suppl. Interrog. Resps. at 90−91; von Kessler Dep. 57:19−58:13.) As for the specific documents at issue, however, "UTC is unable to say with certainty the precise location that each physical copy of the . . . documents was stored." (Suppl. Interrog. Resps. at 116.)

28.     Finally, although, as discussed above, there is no evidence that it did so with Roscigno, UTC's practice is to conduct exit interviews with departing employees to remind them of their confidentiality obligations. It also requires departing employees to return company property prior to their last day, regardless of whether

---

[7] In 2008, UTC transitioned to electronic storage of its proprietary documents and stopped storing physical copies of such documents on its premises. (Suppl. Interrog. Resps. at 116.)

it conducts an exit interview with the departing employee. (Pls.' Friedrich Dep. 90:8−101:22; UTC 2006 Employee Handbook at 8 ("All company property and equipment in the employee's possession or control must be returned prior to the employee's last day.").)

<u>Delaware Patent Litigation</u>

29. UTC first learned that Liquidia possessed its confidential information in May 2021, when Liquidia produced documents containing UTC's confidential information during discovery in patent litigation in Delaware. *See generally United Therapeutics Corp. v. Liquidia Techs., Inc.*, 624 F. Supp. 3d 436 (D. Del. 2022). After UTC attempted to amend its complaint in the patent litigation to add a claim addressing Roscigno's possession of its purported trade secret documents, Roscigno opened and deleted many of the UTC documents that were stored on his Liquidia-issued laptop. (Johnson Report ¶¶ 64−76, Ex. O.)

## II. PROCEDURAL BACKGROUND

30. UTC initiated this action on 10 December 2021, asserting claims under both state and federal law. (Compl., ECF No. 3.) After the matter was designated to this Court, Roscigno removed the case to federal court. (Notice of Removal, ECF No. 6.)

31. On 10 January 2022, UTC filed a First Amended Complaint consisting solely of state law claims, (Am. Compl., ECF No. 15). As a result, the case was remanded on 31 March 2022. *See United Therapeutics Corp. v. Liquidia Corp.*, 2022 U.S. Dist. LEXIS 123346 (M.D.N.C. Mar. 31, 2022).

32.     UTC moved for leave to amend the First Amended Complaint on 10 April 2023, (ECF No. 80).  By order dated 20 July 2023, the Court granted in part UTC's motion, permitting it to add Lung Biotechnology PBC as a plaintiff and to amend its allegations supporting the misappropriation of trade secrets claim.  *See United Therapeutics Corp. v. Liquidia Techs.*, 2023 NCBC LEXIS 88 (N.C. Super. Ct. July 20, 2023).  Plaintiffs then filed a Second Amended Complaint on 7 September 2023.

33.     Liquidia filed this Motion on 3 July 2024, seeking summary judgment on Plaintiffs' claims for misappropriation of trade secrets and unfair or deceptive trade practices.  After full briefing, the Court held a hearing on the Motion at which all parties were represented by counsel.  (Not. of Hr'g, ECF No. 330.)

34.     The Motion is now ripe for disposition.

## III.    LEGAL STANDARD

35.     Summary judgment is only appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that any party is entitled to a judgment as a matter of law."  N.C. R. Civ. P. 56(c).

36.     Genuine issues of material fact are those "which can be maintained by substantial evidence."  *Kessing v. Nat'l Mortg. Corp.*, 278 N.C. 523, 534 (1971).  "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible

inference." *Daughtridge v. Tanager Land, LLC*, 373 N.C. 182, 187 (2019) (citation and quotation marks omitted).

37. In reviewing a motion for summary judgment, the Court must consider all evidence in the light most favorable to the non-moving party. *Belmont Ass'n v. Farwig*, 381 N.C. 306, 310 (2022). Parties moving for summary judgment have "the burden of establishing the lack of any triable issue of fact." *Pembee Mfg. Corp. v. Cape Fear Constr. Co.*, 313 N.C. 488, 491 (1985).

38. A movant may satisfy its burden by proving that "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense, or by showing through discovery that the opposing party cannot produce evidence to support an essential element of [the] claim." *Dobson v. Harris*, 352 N.C. 77, 83 (2000) (citations omitted).

## IV. ANALYSIS

39. Liquidia moves for summary judgment arguing: (1) that the documents at issue are not a protectable compilation or process trade secret; and (2) that UTC did not engage in reasonable efforts to protect its trade secrets. (*See generally* Br. Supp. Def. Liquidia Techs., Inc.'s Mot. Summ. J. [Def.'s Br. Supp.], ECF No. 286 (under seal), ECF No. 357 (public version).) The Court addresses each basis below.

### A. Existence of a Trade Secret

40. "A threshold question in any action involving allegations of misappropriation of trade secrets is whether the information in question constitutes a trade secret" under the North Carolina Trade Secrets Protection Act (NCTSPA),

N.C.G.S. §§ 66-152, *et seq.* *Koch Measurement Devices, Inc. v. Armke*, 2015 NCBC LEXIS 45, at \*10 (N.C. Super. Ct. May 1, 2015) (citing *Combs & Assocs. v. Kennedy*, 147 N.C. App. 362, 369 (2001)).

41.     The NCTSPA defines a trade secret as "business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method, technique, or process" that both:

   a. [d]erives independent actual or potential commercial value from not being generally known or readily ascertainable through independent development or reverse engineering by persons who can obtain economic value from its disclosure or use; and

   b. [i]s the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.C.G.S. § 66-152(3); *see also Sterling Title Co. v. Martin*, 266 N.C. App. 593, 600–01 (2019).

42.     In addition, our courts have employed six factors when determining the existence of a trade secret:

(1) the extent to which the information is known outside the business;

(2) the extent to which it is known to employees and others involved in the business;

(3) the extent of measures taken to guard the secrecy of the information;

(4) the value of information to business and its competitors;

(5) the amount of effort or money expended in developing the information; and

(6) the ease or difficulty with which the information could properly be acquired or duplicated by others.

*Combs & Assocs.*, 147 N.C. App. at 369−70. "These factors overlap, and courts do not always examine them separately and individually." *Vitaform, Inc. v. Aeroflow, Inc.*, 2020 NCBC LEXIS 132, at **19 (N.C. Super. Ct. Nov. 4, 2020).

### 1. __Individual Trade Secret Documents__

43. Liquidia argues that UTC's trade secret claim is based solely on a "compilation" or "process" theory as opposed to a "document-by-document" theory. (Def.'s Br. Supp. 23−25.) UTC disagrees and responds that "Liquidia's argument ignores the pleadings and the substantial record evidence about specific trade secret documents." (Mem. Opp'n Def. Liquidia Techs. Inc.'s Mot. Summ. J [Pls.' Br. Opp'n] 12−17, ECF No. 306 (under seal), ECF No. 365 (public version).)

44. UTC describes it trade secrets as consisting of the following categories of information: (1) financial documents, (2) regulatory strategy and product development planning documents, (3) marketing documents, (4) formulations and pharmacokinetics documents, (5) FDA communications documents, and (6) clinical trial documents. (*See generally* Feigal Report ¶¶ 121−244.)

45. Although UTC contends that the documents in Roscigno's possession, as a whole, provide a "soup-to-nuts roadmap on how to get a drug approved," (Def.'s Byrd Dep. 9:13−18), UTC has also identified by bates numbers in both its Second Amended Complaint and its supplemental interrogatory responses those documents that it contends contain individual trade secrets. (*See* Second Am. Compl. ¶¶ 20, 27; Suppl. Interrog. Resps. at 4−46.) Moreover, one of UTC's experts, Dr. Feigal, also identified these documents in his expert report. (*See* Feigal Report § XIII(A).)

46. Additionally, while Byrd maintains that the "totality" of the information in Roscigno's possession constitutes a trade secret, (*see, e.g.,* Def.'s Byrd Dep. 9:14–20, 11:6–11, 16:13–17, 18:7–12, 19:5–8, 22:11–14, 32:2–7), he, along with others, also references specific trade secret information within some of the individual documents. (*See, e.g.,* Def.'s Byrd Dep. 28:11–23, 30:17–19, 38:3–8, 39:25–40:18, 40:24–41:4 69:2–11; Pls.' Second Byrd Dep. 115:11–17, 117:3–24, 132:6–16, 180:2–15, 202:13–18; Silverman Dep. (Sept.) 86:16–88:14, 106:4–20, 148:2–8, 168:15–169:21; Silverman Dep. (Oct.) 12:6–20, 26:18–27:12, 29:6–22, 30:24–31:17, 32:21–33:12, 36:10–37:4, 39:2–40:24; Second Troy Dep. 269:6–18, 277:18–278:10; Troy Rebuttal Report ¶¶ 20–23.)

47. Given the record evidence, a factfinder could conclude that the UTC Documents contain individual trade secrets that UTC has identified the individual trade secrets with sufficient particularity. *RoundPoint Mortg. Co. v. Florez*, 2016 NCBC LEXIS 18, at **29–30 (N.C. Super. Ct. Feb. 18, 2016) (holding plaintiff met its burden of describing its trade secrets with sufficient particularity where plaintiff described its trade secrets as consisting of specific categories of information and further specified by bates number the documents it believed fell within those categories while supplementing its identification with other evidence).

48. However, Liquidia also argues that UTC cannot recover damages for unjust enrichment for the alleged misappropriation of individual trade secrets because its experts did not apportion damages on a document-by-document basis. It contends, therefore, that "UTC has no evidence to support monetary relief on any one

of the individualized trade secrets." (Def.'s Br. Supp. 12, 23–25.) The Court disagrees.

49. "[T]he party seeking damages bears the burden of showing that the amount of damages is based upon a standard that will allow the finder of fact to calculate the amount of damages with reasonable certainty." *Med. Staffing Network, Inc. v. Ridgway*, 194 N.C. App. 649, 660 (2009). Although the Court has determined that Dr. Feigel, UTC's expert, failed to identify and employ a reliable methodology to apportion damages among the trade secrets UTC asserts are within the documents at issue, (Order on Mot. to Exclude ¶¶ 58–66), the Court cannot conclude from the record presented that UTC is incapable of presenting evidence that would permit a fact-finder to calculate damages with respect to at least some of the alleged trade secrets at issue.

50. In addition, if successful with respect to liability, UTC may be entitled to other forms of relief such as an injunction against future use of its trade secrets or an order conditioning such use on payment of a reasonable royalty. N.C.G.S. § 66-154(a), (a)(1). Punitive damages and/or attorneys' fees are available if willful and malicious misappropriation occurred. N.C.G.S. § 66-154(c), (d).

### 2. **Compilation Trade Secret**

51. Next, Liquidia argues that UTC cannot support its claim for misappropriation of a compilation trade secret because the documents at issue are not a compilation, but are rather "random documents that Roscigno stored to his personal USB thumb drive[.]" It maintains that because UTC has not presented

evidence of the effort expended and the cost involved in compiling the information, it has failed to establish the existence of a compilation trade secret. (Def.'s Br. Supp. 14−19.)

52.     The statutory definition of a trade secret includes a "compilation of information."    N.C.G.S.   § 66-152(3).    However, "[w]hether a compilation or manipulation of information deserves trade secret protection depends on several factors, including the difficulty with which the information could be gathered, compiled, or manipulated." *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at **32 (citing *Byrd's Lawn & Landscaping, Inc.*, 142 N.C. App. 371, 376 (2001)).

53.     While Liquidia argues that the information at issue here was compiled generally in the course of doing business and did not require additional effort or expense, (Def.'s Br. Supp. 17−18), UTC maintains that Roscigno cherry-picked competitively advantageous material to use in a future role. (Pls.' Br. Opp'n 22−24.) This Court has found that a compilation trade secret can exist when the departing employee was the one to curate and compile the information he intended to use competitively. *See Glover Constr. Co., Inc. v. Sequoia Servs., LLC*, 2020 NCBC LEXIS 76, at *10−11 (N.C. Super. Ct. June 18, 2020) (departing employee selected and copied company information); *Sunbelt Rentals, Inc. v. Head & Enquist Equip., L.L.C.*, 2002 NCBC LEXIS 2, at **41−42 (N.C. Super. Ct. July 10, 2002) (concluding that a genuine issue of material fact existed as to whether some or all of the categories of business information taken by departing employees constituted trade secrets).

54. Therefore, it will be for a jury to determine whether Roscigno purposefully compiled these documents at issue to constitute a "roadmap," as UTC maintains, or whether the documents were randomly compiled in the course of doing business, as Liquidia argues.

55. To the extent Liquidia argues that a compilation trade secret does not exist because the compiled information was either publicly available or was otherwise not confidential, the Court disagrees. To be sure, compilations of readily available public information are not usually considered trade secrets. *See Edgewater Servs. v. Epic Logistics, Inc.*, 2009 NCBC LEXIS 21, at **13–14 (N.C. Super. Ct. Aug. 11, 2009) (identifying plaintiff's alleged trade secrets as "carrier files, rates, and customer files" containing information "that can be learned directly from carriers and customers of [plaintiff]."); *Found. Bldg. Materials, LLC v. Conking & Calabrese, Co.*, 2023 NCBC LEXIS 87, at **22 (N.C. Super. Ct. July 7, 2023) (identifying plaintiff's alleged trade secret as a compilation of Outlook contacts consisting of "publicly available names, email addresses and, in some instances, telephone numbers and business addresses.").

56. But here the documents contain "more than just publicly available information." *Blusky Restoration Contrs., LLC v. Brown*, 2024 NCBC LEXIS 105, at **64–66 (N.C. Super. Ct. Aug. 7, 2024) (differentiating compilation trade secrets that contain non-public information). They allegedly contain confidential financial information, regulatory strategy and product development information, marketing information, formulations and pharmacokinetics information, FDA communications,

and clinical trial information that was not readily available as a collection but was curated from confidential files by Roscigno.  The UTC Documents specifically pertain to the development of an inhaled treprostinil treatment for PAH, efforts which UTC considers confidential and proprietary.  (Feigal Report ¶¶ 121–244; Bunce Dep. 151:18–21, 154:20–22, 156:1–3; Def.'s Byrd Dep. 59:2–4.)

57.    Further, the NCTSPA "suggests that a measure of information's commercial value may include a consideration of the value that could be obtained by the specific user that is accused of misappropriation." *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at **32–33.   Roscigno testified he used the documents "to refamiliarize [himself] with the PAH field, [his] publications, and [his prior work]." (Roscigno Aff. ¶ 10.)  He then organized the documents into sub-folders on a Liquidia OneDrive account and accessed the documents multiple times throughout his employment with Liquidia while pursuing the development of an inhaled treprostinil treatment for PAH.  (Pls.' Roscigno Dep. 72:13–73:25; Roscigno Oct. Dep. 174:14–19, 323:17–21; Johnson Report ¶ 104, Table 7.)  UTC's experts opined that Roscigno's possession and use of the documents allowed Liquidia to avoid costs and receive a head start on FDA approval of Yutrepia®.  (Feigal Report, Principal Opinions; Stec Report at 3–4.)   Therefore, UTC has presented evidence to suggest that the documents, as a compilation, "[d]erive independent actual or potential commercial value from not being generally known or readily ascertainable . . . by persons who can obtain economic value from [their] . . . use[.]"  N.C.G.S. § 66-152(3)(a).

58.     Accordingly, the Court concludes that a genuine issue of material fact remains for a jury to determine whether the UTC Documents constitute a protectible compilation trade secret or whether information within those documents amounts to individual trade secrets.  Accordingly, on this basis, the Motion is **DENIED**.

### 3. **Process Trade Secret**

59.     Liquidia argues that, to the extent UTC asserts that the UTC Documents are a process trade secret, its claim fails because the process a company must follow to obtain FDA approval is well known and not unique.  (Def.'s Br. Supp. 19–23.)   UTC responds that Liquidia's argument "ignores the content of the documents and the realities of [the] FDA's drug approval process."  (Pls.' Br. Opp'n 29.)   It contends that its proprietary roadmap to success with an aerosolized treprostinil treatment is more refined than publicly available information about the FDA approval process.  (Pls.' Br. Opp'n 29–33.)

60.     A process can be a trade secret.  *See* N.C.G.S. § 66-152(3) ("'Trade secret' means business or technical information, including but not limited to a formula, pattern, program, device, compilation of information, method technique, or *process . . .* (emphasis added)).   "Such processes, however, must be unique to Plaintiffs or modified by Plaintiffs in unique ways to qualify for trade secret protection under the [NC]TSPA."  *Red Valve, Inc. v. Titan Valve, Inc.*, 2018 NCBC LEXIS 41, at \*\*31–32 (N.C. Super. Ct. Apr. 17, 2018).

61.     A process trade secret may exist even when certain characteristics or components of the process have been publicly disclosed.  When determining whether

such disclosure forecloses trade secret protection, the Court looks to "the ease or difficulty with which the information could properly be acquired or duplicated by others." *SCR-Tech LLC v. Evonik Energy Servs. LLC*, 2011 NCBC LEXIS 27, at **42 (N.C. Super. Ct. July 22, 2011). As this Court has observed:

> If all the individual parts of a process are in the public domain, so that through specific disclosures the entire process can be generally known or readily ascertainable through independent development by those who can obtain economic value through the disclosure, then that entire process will lose any trade secret protection. If part of the process becomes known, but other steps remain undisclosed, then the secret steps may maintain trade secret protection.

*Id.* (collecting cases).

62. In addition to publicly available information, in this case there is evidence that the UTC Documents contain information that is not publicly available. UTC contends that it developed the documents as a strategy or "roadmap" – "a critical part of its process of seeking, and ultimately obtaining, FDA approval for . . . Remodulin® and Tyvaso®." (Suppl. Interrog. Resps. at 38.)

63. It is undisputed that only a fraction of all drug candidates receive marketing approval. (Pls.' Br. Opp'n 29 n. 4 (citing Yamaguci, *et al.*, *Approval Success Rates of Drug Candidates Based on Target, Action, Modality, Application, and Their Combinations*, NATIONAL LIBRARY OF MEDICINE (Apr. 8, 2021).) UTC argues that what makes its approach competitively valuable is that it has fine-tuned the process to achieve success. (*See, e.g.*, Feigal Report, Principal Opinions ¶ 3 (explaining that "[t]here are steps on the drug development path that must be accomplished in series, i.e., one before the other," in order for a product to proceed and that "[t]he [UTC] trade

secrets provided detailed information on how to complete these steps that otherwise would not have been available[.]").)

64. In short, record evidence exists to support a conclusion that the documents at issue constitute a process trade secret. Accordingly, on this basis, the Motion is **DENIED**.

### B. Efforts to Maintain Secrecy

65. Liquidia argues that UTC's trade secret claim fails as a matter of law because, when it comes to efforts to maintain secrecy, UTC does not distinguish between its trade secrets and other confidential information. (Def.'s Br. Supp. 25–31.) UTC responds that the NCTSPA does not require it to draw this distinction and that it takes precautions to protect as secret all of its confidential information, regardless of whether it meets the legal definition of a trade secret or not. (Pls.' Br. Opp'n 26–28.)

66. The NCTSPA requires that trade secret information be "the subject of efforts that are reasonable under the circumstances to maintain its secrecy." N.C.G.S. § 66-152(3)(b). "[T]he statute calls for a fact-specific inquiry regarding whether efforts were 'reasonable.'" *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at **36.

67. The Court agrees with UTC that its failure to differentiate between trade secret and other confidential information when employing protective measures is not necessarily dispositive when it comes to determining whether UTC's trade secret protections were reasonable. *See Byrd's Lawn & Landscaping, Inc.*, 142 N.C.

App. at 375−76 (holding that plaintiff presented sufficient evidence to support a finding that its historical cost information was a trade secret where the information "was treated by plaintiff as *confidential*[.]" (emphasis added)); *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at \*\*37−38 (denying summary judgment where, among other things, the plaintiff company had an employee handbook reciting that all of its information "should be considered *confidential*[.]" (emphasis added)). *See also Glover Constr. Co.*, 2020 NCBC LEXIS, at \*46 ("Many non-lawyers may not know the legal definition of a trade secret.").

68. The record reflects that UTC has an Employee Handbook and a Technology Policy detailing the confidentiality obligations of its employees. (UTC 2006 Employee Handbook at 9; UTC 2005 Technology Policy §§ 1.2, 2.7.) It includes confidentiality and non-competition provisions in its employment agreements and uses non-disclosure agreements with third parties who are exposed to sensitive information. (Dr. Roscigno's 1997 Agreement with UTC; Dr. Roscigno's 2007 Agreement with UTC; von Kessler Dep. 223:25−224:15.) With respect to hard copies of sensitive documents, UTC has presented evidence that it maintains the documents in locked file rooms and locked file cabinets with restricted access. Electronic documents are maintained on password-protected company devices and servers, and access is limited to individuals who are subject to non-disclosure obligations. (Rothblatt Aff. ¶ 4; Suppl. Interrog Resps. 90−91; von Kessler Dep. 57:19−58:11.) UTC also requires departing employees to return company property prior to their last

day and conducts exit interviews with departing employees. (UTC 2006 Employee Handbook at 8; Pls.' Friedrich Dep. 90:8−101:22.)

69. While Liquidia has "produced evidence that could lead a jury to doubt the adequacy of [UTC's] policies . . . the question is whether [UTC] is entitled to ask the jury to undertake an analysis of the reasonableness of [its] efforts to maintain the confidentiality of the information." *RoundPoint Mortg. Co.*, 2016 NCBC LEXIS 18, at **37−38. The Court concludes that UTC's evidence is sufficient to put that question to the jury. *See id.* at **36−38; *Blusky Restoration Contrs., LLC*, 2024 NCBC LEXIS 105, at **66−69.

70. Accordingly, on this basis, the Motion is **DENIED**.

## C. Unfair or Deceptive Trade Practice

71. Because UTC's claim for unfair or deceptive trade practice is based entirely on its claim for misappropriation of trade secrets, (Second Am. Compl. ¶¶ 58−67), the Motion with respect to the UDTPA claim is also **DENIED**. *See Power Home Solar, LLC v. Sigora Solar, LLC*, 2021 NCBC LEXIS 55, at *51 (N.C. Super. Ct. June 18, 2021) ("Our courts have long recognized that claims for misappropriation of trade secrets . . . may form the basis of a UDTPA claim." (cleaned up)).

## V. CONCLUSION

72. **WHEREFORE**, Defendant Liquidia Technologies, Inc.'s Motion for Summary Judgment is **DENIED**. The Court shall set a status conference to determine a trial date in this matter after consultation with counsel.

**SO ORDERED**, this the 29th day of July, 2025.

/s/ Julianna Theall Earp

Julianna Theall Earp
Special Superior Court Judge
  for Complex Business Cases